**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | | |
|---|---|---|
| AT&T CORP., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | Cause No. 6:05-CV-243 |
| | § | |
| NETWORK COMMUNICATIONS INTERNATIONAL CORP., | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM OPINION AND ORDER ON**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Before the court is Plaintiff AT&T Corporations's Motion for Summary Judgment (Doc. No. 29). The Court, having considered said motion, is of the opinion that the following order should issue.

This is a breach of contract claim centered on a dispute over charges for telecommunications services. Plaintiff AT&T Corp. ("AT&T") filed this law suit alleging that Defendant Network Communications International Corp. ("NCIC") breached the parties' contract by refusing to pay certain recurring charges for toll free telecommunications services and seeking payment of the charges due. NCIC denies any duty to pay the claimed charges under the contract and has brought counter-claims alleging that AT&T has breached its contract by overcharging for the same services and that AT&T fraudulently induced NCIC

to enter into the contract by misrepresenting the terms of the contract, specifically, regarding the disputed recurring charges.

AT&T filed the instant motion for summary judgment as to its claim and NCIC's counterclaims on the grounds that there is no genuine issue of material fact that NCIC entered into a contract with AT&T and received certain services under the contract but failed to pay the contract rate for the services, and that no evidence exists to support NCIC's counterclaims.

## I. STANDARD OF REVIEW

A motion for summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). The moving party must show initially that there is no genuine issue of any material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 256 (1986). The moving party may also meet its summary judgment burden by pointing to the absence of evidence supporting any nonmovant party's claim. *Celotex*, 477 U.S. at 325.

A fact is material if it might affect the outcome of the suit under the governing law. *Anderson*, 477 U.S. at 248; *Merritt-Campbell, Inc. v. RxP Products, Inc.*, 164 F.3d 957, 961 (5th Cir. 1999). Issues of material fact are "genuine" only if they require resolution by a trier

of fact and if the evidence is such that a reasonable jury could return a verdict in favor of the moving party. *Anderson*, 477 U.S. at 248; *Merritt-Campbell, Inc.*, 164 F.3d at 961.

A party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials in its pleading, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson*, 477 U.S. at 256. Or, in the case of a no-evidence motion for summary judgment, once the moving party has made an initial showing that there is no evidence to support the nonmoving party's claims, the party opposing the motion must assert competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). Mere conclusory allegations, unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *See Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir.1996); *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir.1994).

When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587; *Merrit-Campbel, Inc.*, 164 F.3d at 961. The party opposing summary judgment is required to identify evidence in the record and articulate the manner in which that evidence supports its claim. *Ragas*, 136 F.3d at 458. "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Irrelevant or unnecessary factual disputes should not be considered. *Id*.

## II. AT&T'S CLAIM

To prove breach of contract, a plaintiff must show: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach. *Crowder v. Scheirman*, 186 S.W.3d 116, 118–19 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (citing *Valero Mktg. & Supply Co. v. Kalama Int'l, L.L.C.*, 51 S.W.3d 345, 351 (Tex. App.—Houston [1st Dist.] 2001, pet. denied)). A cause of action for breach of a promise to pay arises when a demand for payment has been made and refused. *Dorsett v. Cross*, 106 S.W.3d 213, 217 (Tex. App.—Houston [1st Dist.] 2003, pet. denied).

In this case, it is undisputed that the parties entered into a contract under which plaintiff AT&T agreed to supply defendant NCIC with certain services including a quantity of 800 telephone numbers for use in NCIC's telecommunications business. The precise terms of the contract's pricing provisions, and therefore the nature of NCIC's duty to pay certain charges claimed by AT&T, are in dispute. AT&T billed NCIC for recurring charges of $10 per month, and $15 per month after an October 2002 rate increase, for each 800 number acquired by NCIC, rates which AT&T claims are included and agreed to in the parties' contract. NCIC, however, denies that these per-800 number rates are included in the contract, and alleges that an AT&T representative represented to NCIC that it would be billed at a rate of $50 "per routing arrangement" during the term of the agreement. The

question for the court, therefore, is whether a genuine issue of material fact exists as to NCIC's duty to pay the recurring charges under the terms of the parties' agreement.

**A. *The Terms of the Parties' Agreement***

The interpretation of an unambiguous contract is a question of law for the court. *MCI Telecomm. Corp. v. Tex. Utils. Elec. Co*., 995 S.W.2d 647, 650–51 (Tex. 1999). "Whether a contract is ambiguous is a question of law that must be decided by examining the contract as a whole in light of the circumstances present when the contract was entered." *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd*., 940 S.W.2d 587, 589 (Tex. 1996). A contract is not ambiguous if it can be given a definite or certain meaning as a matter of law. *Id*. If, however, the contract is subject to two or more reasonable interpretations after applying the pertinent rules of construction, the contract is ambiguous and a fact issue exists as to the parties' intent. *Id*. An ambiguity does not arise simply because the parties advance conflicting interpretations of the contract. *Id*. For an ambiguity to exist, both parties' interpretations must be reasonable. *Id.*

The Court begins by examining the four corners of the contract and interpreting the contract language according to its plain meaning. *Coker v. Coker* , 650 S.W.2d 391, 393 (Tex. 1983). *See Columbia Gas*, 940 S.W.2d at 589 (considering the contract language when determining whether the contract is ambiguous). In this case, it is undisputed that the written contract consists of a Master Agreement and Contract Tariff No. 16230 (hereinafter the "Contract Tariff" or "CT"). It was the understanding of Mr. William Pope, NCIC's President

and the individual who signed the Master Agreement on behalf of NCIC, that the Master Agreement and Contract Tariff contain the terms and conditions of the parties' agreement. (Pope Dep. 37:22–38:22, Pl.'s Mot. Ex. 3).

The text of the Master Agreement sets out general terms and conditions of the relationship between AT&T and NCIC and references "Attachments" that, according to the Master Agreement, identify the specific contract services and charges. (Pl.'s Mot. Ex. 4, ¶ 2.1). The text of the Contract Tariff sets out the actual services and rates that apply to the parties' agreement. (Pl.'s Mot. Ex. 5). Specifically, the Contract Tariff states that the services provided under the contract are (1) AT&T Uniplan Service OneRate Pricing Option IV (OPRO IV) and Associated Optional Domestic AT&T 800 Services, (2) AT&T ACCUNET T1.5 Service Access Connections, and (3) AT&T Terrestrial 1.544 Mbps Local Channel Services. (CT ¶ 1.A, B, and C, Pl.'s Mot. Ex. 5). For each of these services, the Contract Tariff specifically references AT&T F.C.C. Tariff Nos. 1, 2, 9, 11, and 14.[1] (CT ¶ 1.A, B, and C, Pl.'s Mot. Ex. 5). The Contract Tariff indicates that the "Contract Price" for these services is "the same as the undiscounted Recurring and Nonrecurring Rates and

---

[1] It is undisputed that, prior to July 31, 2001, "F.C.C. Tariffs" were documents that were filed by telecommunications carriers with the Federal Communications Commission that governed the carrier and its relationships with its customers. (Pl.'s Mot. at 11). The "AT&T F.C.C. Tariffs" mentioned in the Contract Tariff detailed the services and rates provided by AT&T to its various customers. After the telecommunications industry was "detariffed" on July 31, 2001, the relationships between carriers and their customers were then governed by contracts between the parties, and the F.C.C. required that telecommunications carriers post their rates and services on their web sites and at their offices for easy customer access.

Charges specified in the AT&T Tariffs listed in Section 1, preceding."[2] (CT ¶ 4.A., Pl.'s Mot. Ex. 5). The parties' contract therefore incorporates certain sections of the AT&T F.C.C. Tariffs by reference.

The Contract Tariff provides, however, that in the event the AT&T F.C.C. Tariffs are ever "detariffed in whole or in part pursuant to a statutory change, order[,] or requirement of a governmental or judicial authority of competent jurisdiction," then the rates for the services provided would be:

> (a) to the extent the Applicable AT&T Tariff provisions remain filed and effective, those rates specified in such Applicable AT&T Tariff provisions, as amended from time to time; and
>
> (b) to the extent that this Contract Tariff contains specific rates or rate schedules that would apply in lieu of (or in addition to) the specified rates or rate schedules in Applicable AT&T Tariffs, such specific Contract Tariff rates and rate schedules; and
>
> (c) *to the extent Applicable AT&T Tariff Provisions are detariffed*, and (b) preceding does not apply*, those rates specified in the applicable AT&T Price Lists, as amended from time to time*.

(CT § II(ii), Pl.'s Mot. Ex. 5 at 3) (emphasis added). The Contract Tariff also indicates that "all references to the AT&T Tariffs in this Contract Tariff shall be construed to mean the AT&T Tariffs specified herein, as well as the documents which will replace those tariffs, including the AT&T Price Lists, when AT&T cancels those tariffs." (*Id.*). After detariffing, therefore, the contract incorporates the AT&T Price Lists by reference.

---

[2] The Contract Tariff also identifies certain waived nonrecurring charges and other usage rates, none of which are the subject of the instant dispute.

The AT&T Price Lists identified in subsection (c), quoted above, are published in AT&T's Business Service Guide, which is available on AT&T's website. (Gritchen Aff. ¶ 3, Pl.'s Mot. Ex. 1). Furthermore, detariffing actually did take place on July 31, 2001. (AT&T Tariff F.C.C. No. 2, Supplement No. 204, Pl.'s Mot. Ex. 6). By the terms of the contract, therefore, the *detariffed* rates for AT&T's services after July 31, 2001 were set out in the AT&T Business Service Guide. (AT&T Tariff F.C.C. No. 2, Supp. No. 204, Pl.'s Mot. Ex. 6).

AT&T's evidence establishes, and NCIC does not dispute, that the rates set out in the actual AT&T F.C.C. Tariffs and Business Service Guide for the services in the contract include a per-*800 number* charge as billed by AT&T, and not just a per-*routing arrangement* charge. (Pl.'s Mot. Ex. 7 and 8). Specifically, F.C.C. Tariff No. 2, Section 6.15.2 indicates that the monthly service charge "per AT&T 800 Service number arranged for AT&T USADirect 800 Service" is $10.00 per 800 number. (Pl.'s Mot. Ex. 8). The Business Service Guide provides that the monthly service charge for "AT&T Direct Toll-Free" service is $15.00 per toll-free number. (Pl.'s Mot. Ex. 7).[3] Though NCIC argues that these rates are not part of the parties' intended contract, as discussed below, nowhere does NCIC maintain

[3] The affidavit of Pam Gritchen, an AT&T representative, indicates that AT&T billed at the rate of $10.00 per month for each 800 number through October 2002 pursuant to F.C.C. Tariff No. 2 and the Business Service Guide. After October 2002, the recurring charge listed in the Business Service Guide increased to $15.00 per month, and after October 2002, NCIC was charged the increased rate.

that these are not the appropriate rates *under F.C.C. Tariff No. 2 and the Business Service Guide*.

Under the clear and unambiguous meaning of the language contained within the four corners of the contract, the parties agreed to monthly recurring charges per-800 number as claimed by AT&T.

### B. *Prior Negotiations or Agreement*

Though NCIC does not dispute AT&T's evidence of what the charges are under the F.C.C. Tariffs and Business Service Guide, NCIC nonetheless claims that the contract is ambiguous and that the F.C.C. Tariffs and Business Service Guide should be disregarded because, first, the F.C.C. Tariffs and Business Service Guide were not actually attached to the Master Agreement and Contract Tariff, and second, because the F.C.C. Tariffs and Business Service Guide are directly contradicted by the parties' prior contract negotiations and AT&T's assurances.[4]

#### 1. Tariffs and Business Service Guide Not Attached

NCIC suggests that the contract is ambiguous because of the Master Agreement's general reference to unidentified "attachments." The AT&T F.C.C. Tariffs and Business

[4] In NCIC's response to AT&T's motion for summary judgment, NCIC argues that, in addition to the monthly recurring charge agreements, the parties also agreed to several other matters regarding billing. (Def.'s Statement of Genuine Facts, ¶ 1). These alleged agreements, however, are not relevant to any claim in AT&T's complaint, nor are they relevant to any defense or counterclaim alleged in NCIC's answer. All claims and counterclaims alleged in this law suit stem solely from the issue of the contract's recurring monthly charges for 800 numbers.

Service Guide, argues NCIC, were not actually *attached* to the agreement, and therefore the contract is ambiguous as it pertains to the rates and charges contained in the F.C.C. Tariffs and Business Service Guide.

In this case, however, the *Contract Tariff*, which is admittedly part of the contract, plainly refers to the specific AT&T F.C.C. Tariffs by number as the source for the contract price for the services identified in the Contract Tariff. Under Texas law, a signed document may incorporate by reference a second unsigned document or writing, provided the signed document plainly refers to the other writing. *MTrust Corp. N.A. v. LJH Corp*. 837 S.W.2d 250, 253–54 (Tex. App.—Fort Worth 1992, writ denied) (citing *Owen v. Hendricks*, 433 S.W.2d 164, 166 (Tex. 1968)). The Contract Tariff plainly refers to the F.C.C. Tariffs and AT&T Price Lists and therefore incorporates these documents by reference. NCIC does not cite any requirement under Texas law that the referenced document be *physically attached* to the signed contract, and the Court has found none.

Furthermore, NCIC cannot argue that failing to attach the document otherwise relieves NCIC of responsibility for complying with the contents of the incorporated document. Under Texas law, courts looking to determine whether an ambiguity exists in a contract should examine the contract as a whole in light of the circumstances present when the contract was entered. *Columbia Gas*, 940 S.W.2d at 589. *See also Mid-Continent Cas. Co. v. Chevron Pipe Line Co.*, 205 F.3d 222, 231 (5th Cir. 2000)(when deciding if contract is ambiguous, "all of the surrounding circumstances" must be taken into account) (citation omitted).

Furthermore, absent fraud, one is presumed to know the contents of a document and has an obligation to protect themselves by reading documents before signing them. *Eubank v. First Nat. Bank of Bellville*, 814 S.W.2d 130, 134 (Tex. App.—Corpus Christi 1991, no writ).

In this case, as to the F.C.C. Tariffs, NCIC's President admits that NCIC, as a telecommunications company, knew at the time that it entered the contract that AT&T routinely filed tariffs with the F.C.C. detailing the charges for AT&T's services. (Pope Dep. 39:24–40:8, Pl.'s Mot. Ex. 3). Indeed, NCIC itself has filed tariffs with the F.C.C. (Pope Dep. 39:14–23, Pl.'s Mot. Ex. 3). NCIC also admits that it read the contract and knew that the services purchased in this particular contract were subject to the specified F.C.C. Tariffs. (Pope Dep. 133:6–136:8, Pl.'s Mot. Ex. 3). Furthermore, the contract clearly indicates that the charges appropriate in the event of detariffing were to be set out in AT&T Price Lists.[5] The F.C.C. Tariff itself was supplemented after detariffing to indicate that the Tariff had been cancelled and that AT&T rates and regulations were now available in the Service Guides available on AT&T's web site. (F.C.C. Tariff No. 2, Supp. 204, Pl.'s Mot. Ex. 6).

---

[5] Texas and Fifth Circuit courts do not appear to have considered the subject of F.C.C. detariffing or the propriety of substituting F.C.C. tariffs with business service guides and price lists in the context of telecommunications contracts. Several other courts, however, have assumed that detariffed rates may be set out in service guides and customer agreements intended to replace the cancelled tariffs. *See Dreamscape Design, Inc. v. Affinity Network, Inc.*, 414 F.3d 665, 667–68 (7th Cir. 2005); *Fortis, Inc. v. U.S.*, 420 F. Supp. 2d 185, 187, 189–90 (S.D.N.Y. 2005); *In re Universal Service Fund Telephone Billing Practices Litigation*, 300 F. Supp. 2d 1107, 1152 (D. Kan. 2003); *Frontline Comm. Intern., Inc. v. Sprint Comm. Co. L.P.,* 178 F. Supp. 2d 432 (S.D.N.Y. 2001).

The circumstances surrounding the formation of the contract indicate that NCIC—a sophisticated and experienced telecommunications firm that was familiar with the role of tariffs in the industry—cannot reasonably maintain that the contract is ambiguous because the F.C.C. Tariffs and Business Service Guide were not physically attached to the contract.

**2. Parol Evidence**

NCIC also claims that the parties' contract is ambiguous because the language of the contract is not consistent with the parties' pre-contractual negotiations and AT&T's assurances. NCIC seeks to admit evidence of the prior negotiations in order to create a fact issue as to the contract's terms. Under Texas law, however, "[p]arol evidence is not admissible for the purpose of creating an ambiguity" in a contract. *National Union Fire Ins. Co. of Pittsburgh, PA v. CBI Industries, Inc.*, 907 S.W.2d 517, 520 (Tex. 1995) (citing *Universal C.I.T. Credit Corp. v. Daniel*, 150 Tex. 513, 517, 243 S.W.2d 154, 157 (1951); *Lewis v. East Texas Finance Co.*, 136 Tex. 149, 154, 146 S.W.2d 977, 980 (1941)). Furthermore, "extrinsic evidence is inadmissible to contradict or vary the meaning of the explicit language of the parties' written agreement." *National Union*, 907 S.W.2d at 521–22 (citing *Hubacek v. Ennis State Bank*, 159 Tex. 166, 171, 317 S.W.2d 30, 32 (1958)). Only *after* a contract is found to be ambiguous may the courts admit extraneous evidence to determine the true meaning of the instrument. *National Union*, 906. S.W.2d at 520 (citing *R & P Enterprises v. LaGuarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517, 518 (Tex. 1980)).

NCIC's extraneous evidence regarding the parties' prior negotiations is not admissible to create an ambiguity in an otherwise unambiguous contract.

Furthermore, the parties agreed to an integration clause in the Master Agreement. An integration clause serves the purpose of triggering the parole evidence rule. *Tri-Steel Structures, Inc. v. Baptist Foundation of Texas*, 166 S.W.3d 443, 451 (Tex. App.—Fort Worth 2005, pet. denied) (citing *Coffman v. Provost * Umphrey Law Firm, LLP*, 161 F. Supp. 2d 720, 728 (E.D. Tex. 2001)). "When parties have concluded a valid integrated agreement with respect to a particular subject matter, the [parol evidence] rule precludes the enforcement of inconsistent prior or contemporaneous agreements." *Hubacek*, 159 Tex. at 170, 317 S.W.2d at 31.

The integration clause in the case at bar provides as follows:

> This agreement constitutes the entire agreement between the parties with respect to the services. This agreement supersedes all prior agreements, proposals, representations, statements or understandings, whether written or oral, or the rights and obligations relating to the services. This agreement shall not be contradicted, or supplemented by any written or oral statements, proposals, representations, advertisements, service descriptions or your purchase order forms not expressly set forth in this agreement or an attachment.

(Pl.'s Mot. Ex. 4, ¶12.9). Mr. Pope, NCIC's President, admitted during his deposition that he read and agreed to the terms of the integration clause when he signed the contract. (Pope Dep. 91:12–92:24, Pl.'s Mot. Ex. 3).

In this case, the subject matter of recurring monthly charges is completely subsumed by the signed contract and all prior inconsistent representations or agreements that relate to recurring monthly charges for 800 numbers are merged into the signed document. Because NCIC alleges a prior inconsistent representation or agreement that relates to recurring charges for 800 numbers, evidence as to that agreement is effectively barred from enforcement or consideration by the parties' integration clause.

Accordingly, the Court finds that the clear and unambiguous language of the contract includes a recurring monthly charge per-800 number as contended by AT&T.

### C. *Breach by NCIC*

AT&T has met its burden to show that no genuine issue as to any material fact exists as to the terms of the contract as to NCIC's duty to pay in accordance with those terms, and NCIC has failed to produce evidence showing that there is a genuine issue for trial. Accordingly, summary judgment in favor of AT&T on its breach of contract claim is proper.

## III. NCIC's COUNTER CLAIMS

### A. *Breach of Contract*

AT&T has also moved for summary judgment on NCIC's counterclaims for breach of contract and fraudulent inducement. NCIC's breach of contract claim rests on the allegation that AT&T did not bill for 800 numbers in accordance with the parties' agreement. Because the Court has found that NCIC's interpretation of the contract is incorrect as a

matter of law, the Court finds that summary judgment in favor of AT&T is appropriate as to NCIC's claim for breach of contract.

**B. *Fraudulent Inducement***

NCIC has also brought a claim for fraudulent inducement. NCIC alleges that, while negotiating the terms of the contract, AT&T made representations to NCIC that there would only be monthly recurring charges *per routing arrangement* for the 800 numbers. NCIC further alleges that AT&T encouraged NCIC to "load up" on additional or extra 800 numbers and NCIC agreed believing that there were no monthly recurring charges per 800 number. NCIC claims that it was induced to enter into the agreement with AT&T based upon these representations. NCIC alleges that AT&T not only improperly charged per routing arrangement, but also for each 800 number, in direct contravention of the representations and statements made by AT&T's representatives. NCIC accordingly seeks to avoid the disputed monthly recurring charges, and seeks refund of those recurring charges for which NCIC has already made payment.

Fraudulent inducement consists of a material representation of fact that (1) was false, (2) that was either known to be false when made or was asserted without knowledge of the truth, (3) that was intended to be acted on, (4) that was relied on, and (5) that caused injury. *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 688 (Tex. 1990). *See also Formosa Plastics Corp. USA v. Presidio Eng'rs & Contrs.*, 960 S.W.2d 41, 46–47 (Tex. 1998) (discussing range of damages available for claim of fraudulent inducement); *Haase v. Glazner*, 62

S.W.3d 795, 798–99 (holding that claim of fraudulent inducement requires inducement to enter a written contract). The parol evidence rule does not bar extrinsic proof of fraudulent inducement. *Burleson State Bank v. Plunkett*, 27 S.W.3d 605, 616 (Tex. App.—Waco 2000, pet. denied) (citing *Dallas Farm Machinery Co. v. Reaves*, 307 S.W.2d 233 (Tex. 1957)).

A plaintiff bringing a fraud claim, however, must have actually and *justifiably* relied on the misrepresentation. *DRC Parts & Accessories, L.L.C. v. VM Motori, S.P.A.*, 112 S.W.3d 854, 858 (Tex. App.—Houston [14 Dist.] 2003, pet. denied) (en banc) (citing *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001); RESTATEMENT (SECOND) OF TORTS § 537 (1977)). Accordingly, a party to an arm's length transaction must exercise ordinary care and reasonable diligence for the protection of its own interests, and a failure to do so is not excused by mere confidence in the honesty and integrity of the other party. *Id.* (citing *Thigpen v. Locke*, 363 S.W.2d 247, 251 (Tex. 1962)). Therefore, "reliance upon an oral representation that is directly contradicted by the express, unambiguous terms of a written agreement between the parties is not justified as a matter of law." *Id.*

In this case, the affidavits of Mr. Pope, NCIC's president, and Rene Brady, AT&T's account representative, indicate that Ms. Brady assured Mr. Pope that the charges for the 800 numbers would be $50 per routing arrangement based upon Tariff No. 2. (Pope Aff. ¶ 8, Def.'s Ex. A; Brady Aff. ¶ 4, Def.'s Ex. B). Mr. Pope claims in his affidavit that Ms. Brady "represented that [NCIC] would be charged 'by the routing arrangement' and not by each separate 800 number." (Pope Aff. 8, Def.'s Mot. Ex. A). During his deposition testimony,

however, Mr. Pope indicated that he is contesting the recurring charges because he was not told about them beforehand. (Pope Dep. 136:24–137:22, Pl.'s Ex. 3). Moreover, Ms. Brady's affidavit, though stating "I believed then and believe now that the 'per routing arrangement charge' is the appropriate charge under the agreement,"[6] does not touch on whether any other recurring charges may have also been appropriate in addition to the charges per routing arrangement. (Brady Aff. ¶ 4, Def.'s Mot. Ex. B). Nevertheless, even if AT&T did represent that the charges per 800 number were not applicable, NCIC's reliance on such an assertion was not justified given the clear and unambiguous language of the contract. *See DRC Parts*, 112 S.W.3d at 858. Accordingly, summary judgment in favor of AT&T is appropriate as to NCIC's fraudulent inducement claim.

## IV. DAMAGES

According to Pam Gritchen, AT&T billed NCIC $10.00 per 800 number through October, 2002, and $15.00 per 800 number after October 2002, pursuant to the F.C.C. Tariff and the Business Service Guide. (Gritchen Aff. ¶ 4, Pl.'s Mot. Ex. 1). Ms. Gritchen attests that NCIC owes AT&T $467,119.23 for unpaid recurring charges for telecommunications services. (Gritchen Aff. ¶ 6, Pl.'s Mot. Ex. 1). Pursuant to section 2.3 of the Master Agreement, AT&T also seeks payment of interest on past due amounts at a rate of 1.5% per month. (Pl.'s Mot. Ex. 4, ¶ 2.3). AT&T also seeks reimbursement for all costs and

[6] It is undisputed that a charge per routing arrangement, in addition to any charge per 800 number, is appropriate under the contract.

reasonable attorneys' fees, as provided for in section 2.3 of the Master Agreement. (Pl.'s Mot. Ex. 4, ¶ 2.3). AT&T asks for $30,497.00 in attorneys' fees and $3,075.24 in related costs. (Pl.'s Mot. at 13–14; Gritchen Aff. ¶ 6, Pl.'s Mot. Ex. 1).

NCIC argues, however, that even if AT&T were entitled to bill per 800 number, AT&T has never accurately billed for such amounts, "apparently including in it's [sic] bills and the claim submitted in this lawsuit charges for ALL 800 numbers, including those never placed in service by NCIC." (Def.'s Statement of Genuine Facts ¶ 8). NCIC further asserts that "[d]uring the term of the 2001 agreement, AT&T permitted BBG Communications, Inc., and [sic] NCIC competitor, to order and use 800 numbers, under NCIC's name and/or with NCIC's address without any knowledge of NCIC," an assertion which, if true, might relate to the accuracy of AT&T's billing. (Def.'s Statement of Genuine Facts ¶ 9). Finally, NCIC points to the deposition of AT&T representative Mr. Sean Burke, who NCIC states was unable to identify which billing statements, if any, accurately set out the charges AT&T seeks to recover. (Def.'s Resp. at 8 (citing Burke Dep. at 21–23, 57–59)). NCIC does not contest the propriety of costs, attorneys' fees, and interest under the contract.

The Court finds, however, that NCIC has not produced evidence sufficient to create a fact issue as to AT&T's damages. NCIC cites no evidence for its first two declarations and relies almost entirely on conclusory allegations and unsubstantiated assertions, neither of which are competent summary judgment evidence. *See Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir.1996). As to the testimony of Sean Burke, Mr. Burkes did not testify that AT&T

was unable to present evidence of the charges, but only that the charges were contained in the various billing statements, all of which were submitted to NCIC and its counsel. (Burke Dep. 21:16–22:3, 22:24–3, 57:14–58:3, 58:9–16, Def.'s Resp. Ex. C). Mr. Burke also testified that NCIC had been billed accurately for the recurring monthly charges and that this action seeks payment for the balance due on NCIC's account. (Burke Dep. 57:4–58:7, 59:9–12, Def.'s Resp. Ex. C). Mr. Burke also confirmed that the amount due for AT&T's services is about $467,119. (Burke Dep. 21:12–15, Def.'s Resp. Ex. C).

Accordingly, the Court finds that AT&T should be awarded damages in the amount of $467,119.23, as well as costs, reasonable attorney's fees, and interest as provided for in the contract.

## V. CONCLUSION

For the reasons set out above, the Court finds that no genuine issue as to any material fact exists as to AT&T's breach of contract claim or as to either of NCIC's counterclaims. The Court finds that summary judgment as to all claims and counterclaims should be granted in favor of Plaintiff, and that NCIC's counterclaims should be dismissed. It is therefore

ORDERED that Plaintiff's Motion for Summary Judgment is hereby GRANTED. It is further

ORDERED that the Defendant's counterclaims are hereby DISMISSED with prejudice. It is further

ORDERED that Plaintiff shall submit for the Court's consideration a proposed final judgment and accompanying brief within 15 days of the date of the signing of this order. Defendant may file any objections and/or a reply brief to Plaintiff's proposed final judgment within 15 days of the date Plaintiff files its proposed final judgment.

**It is SO ORDERED.**

**SIGNED this 17th day of August, 2006.**

MICHAEL H. SCHNEIDER
UNITED STATES DISTRICT JUDGE